IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

ASHLEY N. MAGGARD, as Widow
and Administratrix of the
ESTATE OF CODY S. MAGGARD,

      Plaintiff,

v.                                      CIVIL ACTION NO. 3:22-CV-69
                                        Judge:

NYRSTAR TENNESSEE MINES, STRAWBERRY
PLAINS, LLC, a Tennessee LLC,
BROOKVILLE EQUIPMENT CORPORATION,
a Pennsylvania Corp., and BROOKVILLE
SERVICES, LLC, a Pennsylvania LLC,

      Defendants.

## COMPLAINT

For her Complaint against the defendants, the plaintiff alleges the following:

## PARTIES

1. The plaintiff, Ashley Maggard, is a citizen and resident of Rock-Holds, Kentucky, and is the widow of plaintiff's decedent Cody Maggard. The plaintiff, Ashley Maggard, was appointed the Administratrix of the Estate of Cody Maggard by the Clerk of the Bell County District Court of the Commonwealth of Kentucky on March 17, 2021.

2. The decedent Cody Maggard was a resident of Rock-Holds, Kentucky, and at all times relevant, was employed by defendant, Nyrstar Tennessee Mines, Strawberry Plains, LLC, at the Immel Mine located in Mascot, Knox County, Tennessee.

3. Defendant Nyrstar Tennessee Mines, Strawberry Plains, LLC ("Nyrstar") is a Tennessee limited liability company with its principal office in Strawberry Plains, Tennessee. Defendant Nyrstar is primarily engaged in the mining business, including the operation of the

1

Immel underground zinc mine, operating under MSHA ID No. 40-00170. As such, defendant Nyrstar is, and at all times relevant herein was, regulated by the United States Department of Labor Mine Safety and Health Administration ("MSHA") and was responsible for compliance with all applicable MSHA and WVOMHST rules and regulations, as well as commonly accepted and well known safe mining practices used in the mining industry, in the operation of its Immel Mine.

4. The defendants, Brookville Equipment Corporation and Brookville Services, LLC (collectively referred to as "Brookville Defendants"), are entities organized and existing under the laws of the Commonwealth of Pennsylvania, with their principal place of business in Brookville, Pennsylvania, and regularly transacting business within the State of Tennessee. The Brookville Defendants, at all times relevant, are and were engaged in the business of manufacturing, remanufacturing, modifying and/or altering, fabricating, retrofitting, designing, packaging, shipping, selling, repairing, servicing, and/or distributing underground mining equipment including but not limited to the subject 1993 Brookville 12-ton locomotive (company number 21001/model BCC-12-UP). Defendant Brookville Services operates under MSHA contractor identification T447, and as such, is required to comply with all applicable rules and regulations imposed by the United States Department of Labor's Mine Safety and Health Administration.

**JURISDICTION AND VENUE**

5. Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. §1332 in that there is diversity of citizenship between the parties and the amount in controversy exceeds $75,000.00. Venue is proper before this Court since the subject incident resulting in the death of plaintiff's decedent, Cody Maggard, and damages occurred within the Eastern District of Tennessee in or near Mascot, Knox County, Tennessee.

# FACTS

6. At all times relevant, plaintiff's decedent, Cody Maggard, was employed by defendant Nyrstar as a locomotive operator and chute puller. Mr. Maggard worked at Nyrstar's Immel Mine, which is located in Knox County, Tennessee.

7. The Immel underground mine extracts lead-zinc ore by blasting. Front-end loaders load the material into haul trucks, which transport the ore to a hopper. The ore is fed down the hopper into a chute. Locomotives move the train cars under the chute where ore is loaded and transported to the underground dump. From the underground dump, the ore is loaded into a skip hoist that then transports the ore to the surface.

8. On February 22, 2021, Cody Maggard and Harold Hackney, both locomotive operators and chute pullers, traveled underground to begin their duties. The two (2) miners had worked together for about five months, loading and hauling mined ore using a track-mounted locomotive, which was manufactured, re-manufactured, designed, fabricated, modified, re-built, marketed, shipped, sold, distributed, repaired, serviced, and/or marketed by the Brookville Defendants.

9. The subject Brookville locomotive being used by Mr. Maggard and Mr. Hackney on February 22, 2021 was a 1993 12-ton rail mounted diesel locomotive (company number 21001/model BCC-12-UP).

10. The Brookville Defendants, in 2013 and 2014, issued two (2) Product Information Bulletins (Bulletins 70 and 71). Bulletin 70 described the proper procedures for inspecting brake shoes for maximum allowance. Bulletin 71 clarified the proper procedures for performing a brake test. The Bulletin 71 brake test procedure requires the mine operator to set the parking brake on the locomotive, place the transmission in the highest gear, and then move the throttle to the fully

3

position. The subject locomotive being operated by Maggard and Hackney on February 22, 2021, had a transmission shifter interlock that would not allow the transmission to engage without releasing the parking brake. Bulletin 71 states that a locomotive with this interlock **must have an emergency/park brake test button** on the operator's control panel to allow performance of this brake test.

11. The Brookville defendants, from the time of manufacturer and at a minimum from the time the subject Bulletin 71 was published in 2014, had a continuing duty each and every day they did not install, equip and/or retrofit the subject locomotive with the required emergency/park brake test button. The subject locomotive being operated by Maggard and Hackney seven (7) years after Bulletin 71 was issued, still did not have the required emergency/park brake test button, as the Brookville defendants never retrofitted and/or modified the subject locomotive or any of the Brookville locomotives at the Immel Mine, with the required emergency/park brake test button. As such, neither Maggard nor Hackney could perform a proper brake test on the subject locomotive according to Bulletin 71 putting them at risk of serious injury or death.

12. On February 22, 2021, the miners (Maggard and Hackney) were assigned to work in an area known as the 484 Gallery chute to load ore into cars. To load the cars, the locomotive operator, Hackney, would push the cars under the chute and attempt to stop the locomotive just after the back of the last car was under chute and the locomotive was almost against the chute. This was the process Nyrstar had been using for years at the mine.

13. Nyrstar and mine management knew the process of loading cars at the 484 Gallery chute was dangerous and deadly for several reasons, including:

- The chute extends 40 inches into the track haulageway;

- The suspended stationary chute is two (2) inches above the front plate of the operator's compartment on the subject locomotive. While the ore cars are lower than the chute and can pass underneath it, the operator's compartment in the locomotive is higher than the front plate and cannot pass under the chute. As a result, the chute intrudes directly into the operator's compartment of the subject locomotive where the miners are seated.

- Nyrstar did not install low clearance warning signs or lights along the track leading to the 484 Gallery chute to alert miners of a low clearance area nor did Nyrstar mark the chute as being a low clearance hazard.

- The track near the 484 Gallery chute was always covered with water. Water reduces the cohesive friction of the track, which increases the stopping distance for the locomotive. However, Nyrstar did not identify water on the track, which existed for several shifts prior to February 22, 2021, as a hazardous condition in the mine's workplace examination record.

- There were no stopblocks or derail devices in place in the ore loading area to stop the locomotive and prevent it from traveling into the chute and injuring or killing individuals in the locomotive.

14. Despite these known dangers that will result in injury or death, Nyrstar intentionally and deliberately required Maggard and Hackney to operate the locomotive with a known defective brake system and load cars in this specific unsafe area in order to ensure production. As a result of this outrageous conduct, one can reasonably conclude that Nyrstar actually intended to injure or kill both Maggard and Hackney on February 22, 2021.

15. At approximately 3:36 p.m., Hackney was operating the subject locomotive and Maggard was in the passenger compartment as they approached the 484 Gallery Chute to load the cars. When the locomotive was within 20 feet of the chute, video surveillance of the area depicts the locomotive not decelerating. Hackney and Maggard attempted to apply the service brake. The locomotive did not stop and violently collided with the chute. The locomotive crushed Maggard, who was in the passenger compartment, between the chute and locomotive deck resulting in fatal injuries.

16. Cody Maggard was transported by EMS to the Regional Forensics Center in Knoxville, Tennessee where he was pronounced dead at 5:10 p.m.

17. Following the incident, the United States Department of Labor, Mine Safety and Health Administration ("MSHA") performed a comprehensive investigation of this fatal incident. MSHA concluded that the incident occurred because defendant Nyrstar did not: (1) properly maintain the braking system on the locomotive; (2) have procedures and rail devices to prevent locomotives from traveling into the chute; (3) have a warning sign or light to alert miners of the low clearance hazard between the chute and the operator's deck of the locomotive; (4) properly conduct an examination of the locomotive; (5) properly maintain the track, as it was covered in water; and (6) report track hazards or locomotive defects on the workplace examination record.

18. MSHA issued two (2) 104(d)(1) unwarrantable failure citations to Nyrstar for engaging in aggravated conduct in violating mandatory mine safety regulations. The first citation was for a violation of 30 CFR 57.14102, as the braking system on the locomotive was not maintained in a functional condition. MSHA found the following deficiencies immediately after the incident:

- The left front and rear brake shoes were not inspected as required and were excessively worn.
- The emergency/park brake could not be tested because the locomotive was equipped with a feature that would not allow the transmission to engage unless the emergency/park brake is released. The Brookville Defendants published PIB 71, dated April 11, 2014, which states that locomotives with this feature should be provided with an emergency/park brake test button on the operator's control panel that will allow the brake test to be performed. Following the incident, the Brookville Defendants installed the appropriate test button on the subject locomotive as well as on all other Brookville locomotives at the mine.
- The uneven wear between the left and right-side brake shoes indicates that the brake system was not maintained in proper adjustment.
- The slack adjusters on both the operator and offside brake canisters had excessive travel resulting in decreased pressure inside of the chamber. This reduced the braking capability of the locomotive.
- The hanger pins had a noted diameter difference between their respective linkage holes which causes excess play and movement which contributes to uneven wear and component deterioration.
- Brake components were rusted and muddy from traveling through water over the track rails.

The improperly inspected and maintained braking system increased the stopping distance and time of the locomotive which contributed to this fatal incident. MSHA concluded that defendant Nyrstar engaged in aggravated conduct in that the locomotive was allowed to be operated by

7

Case 3:22-cv-00069-JRG-JEM   Document 1   Filed 02/21/22   Page 7 of 17   PageID #: 7

miners without a properly maintained or inspected braking system. Defendants Nyrstar and Brookville disregarded the Brookville bulletins which were published in 2013 and 2014, as the locomotive should have been removed from service due to its defective and unsafe condition.

19. MSHA issued a second 104(d)(1) unwarrantable failure citation to defendant Nyrstar for a violation of 30 CFR 57.9302. MSHA determined that despite the known defective braking system on the subject locomotive, defendant Nyrstar did not install stopblocks, derail devices, or other devices to stop the locomotive before colliding with the 484 Gallery chute. Nyrstar intentionally assigned a team of two (2) miners (Maggard and Hackney) to operate the subject defective and unsafe locomotive to load ore cars under the chute, which protrudes into the track haulageway directly in the path of the locomotive's passenger side (where Maggard was at the time of the incident). The deck of the locomotive is open with no protection for the passenger. A stop block or derail device would have prevented the operator's deck from contacting the chute. MSHA concluded that defendant Nyrstar engaged in aggravated conduct by knowingly and intentionally permitting the practice of driving the locomotive dangerously close to the chute during the loading process without any protection against moving or runaway rail equipment. This is an unwarrantable failure to comply with a mandatory standard.

20. MSHA also issued two (2) other citations to defendant Nyrstar for violating 30 CFR 57.9101 and 30 CFR 57.18002. The basis for these citations were related to the condition of the track (water was over the ball of the rails in the specific area); no warning devices to alert miners of the upcoming low-clearance hazard nor was the chute conspicuously marked as being a restricted clearance hazard; failure to conduct an adequate examination for conditions that adversely affect safety and health at the 484 Gallery chute; and no stop blocks, derails, or other devices were installed in the area.

21. Defendant Nyrstar is responsible and liable to the plaintiff because it is possible to conclude from the facts of this incident that defendant Nyrstar actually intended to injure and/or kill plaintiff's decedent, Cody Maggard (and Mr. Hackney).

22. The Brookville defendants are responsible and liable to the plaintiff, as third parties, under negligence and product liability theories for failing to ensure that the subject locomotive had the required emergency/park brake test button on the operator's control panel that will allow the brake test to be performed as mandated by Brookville's own published bulletin in 2014 and permitting a known defective product to be operated.

23. At the time of his death, Cody Maggard was a strong, able-bodied and gainfully employed man. He was an active and productive citizen who took great pride in his family and not only fully supported financially, but frequently aided, advised, and counseled with his wife, plaintiff Ashley Maggard. By reason of the death of her husband, the plaintiff, Ashley Maggard, has been deprived of his support, comfort, society, advice, daily acts of love and affection and services all of which were substantial and of great value.

24. Defendants are liable for the pecuniary, economic, and non-economic value of the life of Cody Maggard, and his last death expenses and all other damages recoverable under the laws of the State of Tennessee.

25. Plaintiff's damages include funeral and burial expenses, lost income, pre-death pain and suffering, mental anguish and emotional distress, loss of decedent's love and companionship, and other general and special damages in an amount to be determined by the jury at trial of this action.

# COUNT I
## INTENTIONAL TORT EXCEPTION TO WORKERS' COMPENSATION IMMUNITY
## DEFENDANT NYRSTAR

26. The plaintiff repeats and incorporates here by reference the allegations contained in paragraphs 1 through 25 of this Complaint as if set forth herein verbatim.

27. Tennessee law provides an exception to the workers' compensation exclusivity provision if the employee (or the personal representative of his/her estate) can show that the employer (in this case defendant Nyrstar) actually intended to injure the employee (Maggard).

28. Defendant Nyrstar intentionally assigned Maggard and Hackney to operate a known unsafe locomotive with a defective braking system to load ore cars along slick wet track rails in the 484 Galley chute area where the chute protrudes directly out into the track haulageway in the path of the locomotive's passenger side and the deck of the locomotive is completely open with no protection for the passenger. Nyrstar did not install any stop block or derail device that would have prevented the operator's deck from contacting the chute. As a result of this intentional conduct, it is reasonable to conclude that defendant Nyrstar actually intended to harm, injure and/or kill Cody Maggard (and his co-worker, Mr. Hackney) on February 22, 2021.

WHEREFORE, Plaintiff prays for Judgment under Count I of her Complaint against Defendant Nyrstar, for compensatory damages in such amounts as may be determined by the jury at trial, costs incurred, and for such further relief as the Court deems just and proper.

# COUNT II
## STRICT PRODUCT LIABILITY
## BROOKVILLE DEFENDANTS

29. The plaintiff repeats and incorporates here by reference the allegations contained in paragraphs 1 through 28 of this Complaint as if set forth herein verbatim.

30. On or before February 21, 2021, the Brookville defendants (either one and/or both) designed, manufactured, assembled, rebuilt, modernized, modified, marketed, sold, serviced, distributed and/or placed into the stream of commerce the subject 12-ton rail-mounted diesel locomotive which was used by the plaintiff's decedent in the manner for which it was designed, manufactured, and marketed by the Brookville defendants.

31. The Brookville defendants violated Tennessee Code Annotated sections 29-28-101 et. seq., and plaintiff hereby incorporates the provisions of the above-cited statute by reference as if fully restated herein.

32. The subject locomotive used by plaintiff's decedent was defective, unreasonably dangerous and not reasonably safe from the time it was designed, manufactured, marketed, sold and/or distributed until the plaintiff's decedent was fatally injured in that the braking system on the subject locomotive was defective as it was not equipped with the appropriate emergency/park brake test control button.

33. As a direct and proximate result of the Brookville defendants' defective and unreasonably dangerous locomotive, the Brookville defendants (either individually or in combination) are strictly liable for the injuries and death of Cody Maggard.

WHEREFORE, Plaintiff prays for Judgment under Count II of her Complaint against the Brookville Defendants, for compensatory damages in such amounts as may be determined by the jury at trial, costs incurred, and for such further relief as the Court deems just and proper.

## COUNT III
## BREACH OF WARRANTY
## BROOKVILLE DEFENDANTS

34. The plaintiff repeats and incorporates here by reference the allegations contained in paragraphs 1 through 33 of this Complaint as if set forth herein verbatim.

35. The Brookville defendants, continuously day-to-day from the time the subject locomotive was designed and manufactured until Mr. Maggard's death, expressly and impliedly warranted to all owners and operators of the subject Brookville locomotive through their actions, representations, promises, affirmations, bulletins, promotions, product literature, photographs, and promotional material, to all prospective consumers and the public generally, including the plaintiff's decedent, that the subject locomotive which the Brookville defendants (individually or in combination) designed, manufactured, assembled, rebuilt, modernized, modified, sold, serviced, marketed and/or distributed was of such quality and reasonably fit for the purpose of serving as a safe underground rail locomotive.

36. The plaintiff's decedent made use of the subject Brookville locomotive as alleged herein and relied on the express and implied warranties made by the Brookville defendants through their actions, representations, promises, bulletins, affirmations, promotions, product literature, photographs, and promotional material (either individually or in combination) that the subject locomotive was fit for the purpose of serving as a safe underground rail locomotive.

37. The Brookville defendants breached their express and implied warranties of fitness and merchantability by defectively designing, manufacturing, assembling, building, modernizing, selling, modifying, servicing, marketing, and/or distributing the subject locomotive which was unreasonably dangerous and not reasonably safe for the use to which it was intended as reflected throughout the defendants' actions, representations, promises, affirmations, promotions, bulletins, product literature, photographs, and promotional material.

38. The Brookville defendants' breach of warranties as described herein directly and proximately caused the injuries and death of Cody Maggard.

WHEREFORE, Plaintiff prays for Judgment under Count III of her Complaint against the Brookville Defendants, for compensatory damages in such amounts as may be determined by the jury at trial, costs incurred, and for such further relief as the Court deems just and proper.

## COUNT IV
## NEGLIGENCE
## BROOKVILLE DEFENDANTS

39. The plaintiff repeats and incorporates here by reference, the allegations contained in paragraphs 1 through 38 of this Complaint as if set forth herein verbatim.

40. At all times relevant hereto, the Brookville defendants negligently designed, manufactured, sold, marketed, and distributed the subject locomotive in its defective and unreasonably dangerous condition.

41. The Brookville defendants were negligent in manufacturing and designing a locomotive that was unreasonably dangerous in its normal and ordinary use. It was defectively designed and manufactured with a braking system that was defective as it was not equipped with the appropriate emergency/park brake test control button so the operator could properly test the brakes to ensure that the locomotive could effectively stop. As a result, the subject locomotive being operated by Hackney, upon which decedent Maggard was a passenger, could not stop on the slick wet track rail and collided with the ore chute which resulted in Mr. Maggard's death. The Brookville defendants were further negligent in one or more of the following respects, to wit:

   a.) failing to adequately test the subject locomotive;

   b.) utilizing inferior component parts which significantly impaired the safe operation of the locomotive and increased risk of severe injury or death to operators, users, and consumers, including the plaintiff's decedent;

c.) failing to provide adequate instructions and warnings so that the ultimate purchaser or user would have sufficient information pertaining to the safe and proper use of the locomotive;

d.) failing to recall the subject locomotive so as to prevent the incident resulting in plaintiff's decedent's death; and

e.) failing to provide an adequate safety mechanism which would have prevented plaintiff's decedent's death.

42. As a direct and proximate result of the Brookville defendants' negligent design, manufacture, sale, and distribution of the subject locomotive, plaintiff's decedent, Cody Maggard was fatally injured.

WHEREFORE, Plaintiff prays for Judgment under Count IV of her Complaint against the Brookville Defendants, for compensatory damages in such amounts as may be determined by the jury at trial, costs incurred, and for such further relief as the Court deems just and proper.

## COUNT V
## NEGLIGENCE
## BROOKVILLE SERVICES, LLC

43. The plaintiff repeats and incorporates here by reference, the allegations contained in paragraphs 1 through 42 of this Complaint as if set forth herein verbatim.

44. At all times relevant hereto and as stated on its own website, defendant Brookville Services provides maintenance support, fleet management services, and rebuild programs for Brookville fleet, which would include the subject locomotive. Defendant Brookville services provides on-the-road personnel who handle the maintenance program for Brookville units in the field, which would include the subject locomotive. Defendant Brookville Services employees travel daily to sites (including Nyrstar's Immel Mine) in order to provide OEM service. In addition, defendant Brookville Services' employees assist its customers, including Nyrstar, with

operation, training/commissioning, and service of their Brookville machines, including the subject locomotive. As such, defendant Brookville Services had a continuing day to day duty of ordinary care to provide reasonable services and support to the Brookville fleet, including the subject locomotive at Nyrstar's Immel Mine.

45. The Brookville Defendants, in 2013 and 2014, issued two (2) Product Information Bulletins (Bulletins 70 and 71). Bulletin 70 described the proper procedures for inspecting brake shoes for maximum allowance. Bulletin 71 clarified the proper procedures for performing a brake test. The Bulletin 71 brake test procedure requires the mine operator to set the parking brake on the locomotive, place the transmission in the highest gear, and then move the throttle to the fully position. The subject locomotive being operated by Maggard and Hackney on February 22, 2021, had a transmission shifter interlock that would not allow the transmission to engage without releasing the parking brake. Bulletin 71 states that a locomotive with this interlock must have an emergency/park brake test button on the operator's control panel to allow performance of this brake test.

46. The Brookville defendants, from the time these bulletins were published in 2013 and 2014 respectively, had a continuing duty each and every day to install, equip, modify and/or retrofit the subject locomotive with the required emergency/park brake test button so that the brakes on the subject locomotive could be properly tested. The subject locomotive being operated by Maggard and Hackney seven (7) years after the product bulletins were issued still did not have the required emergency/park brake test button. As such, neither Maggard nor Hackney could perform a proper brake test on the subject locomotive according to Bulletin 71 putting them at risk of serious injury or death.

47. As a result of the above-referenced conduct, defendant Brookville Services negligently breached its continuing day-to-day duty of ordinary care to plaintiff's decedent, Cody Maggard, by failing to act as a reasonable and prudent fleet service and maintenance company. Defendant Brookville Services failed to ensure that the subject locomotive was equipped with the required emergency/park brake test button so the locomotive operator can properly test the brakes and failed to ensure that the braking system on the subject locomotive was properly serviced, maintained, and in good working condition so the locomotive could be effectively stopped.

48. As a direct and proximate result of defendant Brookville Service, LLC's negligence, plaintiff's decedent, Cody Maggard was fatally injured.

WHEREFORE, Plaintiff prays for Judgment under Count V of her Complaint against the Brookville Defendants, for compensatory damages in such amounts as may be determined by the jury at trial, costs incurred, and for such further relief as the Court deems just and proper.

## COUNT VI
## LOSS OF CONSORTIUM

49. The plaintiff repeats and incorporates here by reference, the allegations contained in paragraphs 1 through 48 of this Complaint as if set forth herein verbatim.

50. As a result of the carelessness, negligence and recklessness of the Defendants, plaintiff Ashley Maggard has been deprived and will continue to be deprived of her husband's society, companionship, support and services of her husband, aid, comfort and companionship, all to her great detriment and loss.

WHEREFORE, Plaintiff prays for Judgment under Count VI of her Complaint against the Defendants, for compensatory damages in such amounts as may be determined by the jury at trial, costs incurred, and for such further relief as the Court deems just and proper.

## GENERAL PRAYER FOR RELIEF

WHEREFORE, the plaintiff demands judgment against the defendants in an amount to be determined by a jury in accordance with the laws of the State of Tennessee together with pre-judgment and post-judgment interest, costs and attorney fees and for such further relief as this Court deems just and reasonable.

## DEMAND FOR TRIAL BY JURY

Plaintiff prays that the causes of action alleged herein be tried in this Court before a jury of their peers.

**ASHLEY N. MAGGARD, as Widow
and Administratrix of the
ESTATE OF CODY S. MAGGARD,**

By Counsel,

*/s/ Ronald J. Berke*
Ronald J. Berke (TNSB #1741)
Berke, Berke & Berke
420 Frazier Avenue
P.O. Box 4747
Chattanooga, TN  37405
Phone: (423) 266-5171
Fax: (423) 265-5307
ronnie@berkeattys.com

J. Ryan Stewart (WVSB #10796)
*To be admitted Pro Hac Vice*
BAILEY JAVINS & CARTER, LC
213 Hale St.
Charleston, WV 25301
Phone: 304-345-0346
Fax: 304-345-0375
rstewart@bjc4u.com
*Counsel for Plaintiff*