| | |
|---|---|
| ASHLEY N. MAGGARD, as Widow and Administratrix of the Estate of CODY S. MAGGARD, <br><br>  Plaintiff, <br><br> v. <br><br> NYRSTAR TENNESSEE MINES, STRAWBERRY PLAINS, LLC, BROOKVILLE EQUIPMENT CORPORATION, and BROOKVILLE SERVICES, LLC, <br><br>  Defendants. | No. 3:22-CV-00069-JRG-JEM |

## **MEMORANDUM OPINION AND ORDER**

Plaintiff Ashley Maggard, as Widow and Administratrix of the Estate of Cody S. Maggard, brought this six-count action against Defendants Nyrstar Tennessee Mines - Strawberry Plains, LLC ("Nyrstar"), a Tennessee-based mining company, and Brookville Equipment Corporation ("Brookville Equipment") and Brookville Services, LLC ("Brookville Services") (collectively "the Brookville Defendants"), Pennsylvania-based companies engaged in the manufacture and maintenance of underground mining equipment. [Compl., Doc. 1 ¶¶ 1–4.] She alleges an intentional tort (Count I) and loss of consortium (Count VI) against Nyrstar; products-liability—under theories of strict liability, breach of warranty, and product negligence (Counts II–IV)—and loss of consortium (Count VI) against the Brookville Defendants; and negligent services (Count V) against Brookville Services.

Before the Court is Nyrstar's Corrected Motion to Dismiss Counts I and VI and Memorandum in Support [Docs. 21–22], Plaintiff's Response in Opposition [Doc. 23], and Nyrstar's Reply [Doc. 28]; and the Brookville Defendants' Joint Motion to Dismiss Counts II–VI

1

and Memorandum in Support [Doc. 17] and Plaintiff's Response in Opposition [Doc. 25]. For the reasons stated below, Nyrstar's motion is **GRANTED** and the Brookville Defendants' motion is **GRANTED IN PART**, as to Counts II–IV and VI against Brookville Equipment and Counts II–IV against Brookville Services, and **DENIED IN PART**, as to Counts V and VI against Brookville Services.

## I. BACKGROUND

Nyrstar operates the Immel lead-zinc ore mine in Knox County, Tennessee. [Compl., Doc. 1 ¶ 3.] At the mine, lead-zinc ore is extracted through a multi-step process. [*Id.* ¶ 7.] First, the ore is blasted underground; then it is loaded into a hopper and fed down a chute into hopper cars attached to a locomotive; the locomotive transports the ore to an underground dump; and, finally, the ore is hauled to the surface by a skip hoist. [*Id.* ¶ 7.]

The 484 Gallery is an area of the mine where ore is fed down a chute and loaded into hopper cars. [*Id.* ¶ 12.] To access the Gallery, locomotives must travel along a wet and slick track. [*Id.* ¶ 13.] In the Gallery, the ore chute is suspended high enough over the track so that hopper cars can pass underneath, but it hangs too low for locomotives to pass underneath. [*Id.*] There are no warning signs or lights alerting locomotive operators to the chute's low clearance and there are no stopblocks or other stopping devices to prevent locomotives from colliding with the chute. [*Id.*] Thus, Nyrstar's locomotive operators are expected to be aware of the chute's location and, when operating near it, to keep enough distance between it and their locomotives to avoid a collision. [*Id.* ¶¶ 12–13.]

On February 22, 2021, Nyrstar employees Harold Hackney and Cody Maggard were assigned to work the 484 Gallery. [*Id.* ¶¶ 6, 8, 12.] Mr. Hackney, the locomotive operator, was driving a 1993 12-ton locomotive ("the subject locomotive") manufactured and distributed by

Brookville Equipment and serviced by Brookville Services. [*Id.* ¶¶ 9, 12.] Mr. Maggard, the chute puller, was a passenger on the subject locomotive. [*Id.* ¶¶ 12, 15.] To load the ore, Mr. Hackney would position the hopper cars under the chute and Mr. Maggard would dismount the subject locomotive, open the chute release, and fill the cars with ore. [*Id.* ¶¶ 8, 12.]

The accident giving rise to this action, which was captured by the mine's video surveillance system, occurred while Mr. Hackney and Mr. Maggard were approaching the chute to position the hopper cars to be filled. [*Id.* ¶ 15.] As seen in the surveillance video, when the subject locomotive was within twenty feet of the chute it was not decelerating. [*Id.*] Both men attempted to apply the service break but the locomotive did not stop. [*Id.*] It then collided with the chute and Mr. Maggard was crushed between the chute and the locomotive's passenger compartment resulting in fatal injuries. [*Id.*]

After the accident, the United States Department of Labor, Mine Safety and Health Administration ("MSHA") conducted an investigation and issued a report of investigation identifying the accident's root causes. [*Id.* ¶ 17.] The MSHA concluded that the accident was the result of Nyrstar's failure to: (1) maintain the locomotive's braking system (which was excessively worn and not properly adjusted); (2) have procedures and devices to prevent the locomotive from colliding with the chute; (3) warn of the low clearance between the chute and locomotive deck; (4) conduct an examination of the locomotive; (5) properly maintain the track (which was wet at the time of the accident); and (6) identify track hazards.[1] [*Id.* ¶¶ 17–18.]

Prior to the accident, in 2013, Brookville Equipment issued a product information bulletin describing the proper procedures for inspecting brake shoes for maximum wear allowance

---

[1] The MSHA's Final Report is publicly available on its website: https://www.msha.gov/data-reports/fatality-reports/2021/february-22-2021-fatality/final-report (last visited Oct. 6, 2022).

3

("Bulletin 70"). [*Id.* ¶ 45.] In 2014, it issued another bulletin clarifying the proper procedures for performing a brake test ("Bulletin 71"). According to Bulletin 71, to conduct a proper brake test on locomotives with a transmission interlock system, like the subject locomotive, the operator's panel had to be equipped with an emergency/park brake test button. [*Id.*] The subject locomotive, however, was not equipped with an "emergency/park brake test button"; thus, its braking system could not be properly tested. [*Id.* ¶¶ 10–11.]

## II. PROCEDURAL POSTURE

Mr. Maggard's widow brought this damages action against Nyrstar and the Brookville Defendants. She alleges an intentional tort against Nyrstar for "intentionally and deliberately" requiring Mr. Maggard to operate a locomotive with a known defect in an unsafe area (Count I). [*Id.* ¶¶ 14, 26–28.] She alleges products-liability—under theories of strict liability, breach of warranty, and product negligence—against the Brookville Defendants for failing to retrofit the subject locomotive with an emergency/park brake test button so that its braking system could be properly tested and maintained (Counts II–IV). [*Id.* ¶¶ 29–42.] Additionally, she alleges that Brookville Services, as Nyrstar's maintenance service provider, negligently serviced the subject locomotive (Count V). [*Id.* ¶¶ 43–48.] Lastly, she alleges loss of consortium against all Defendants (Count VI).

Nyrstar has moved to dismiss Plaintiff's intentional tort and loss of consortium claims on grounds that they are barred by the exclusivity provision of the Tennessee Workers' Compensation Law ("TWCL"), Tenn. Code Ann. § 50-6-108. [Doc. 21.] The Brookville Defendants have jointly moved to dismiss Plaintiff's products-liability claims, negligence claim against Brookville Services, and loss of consortium claims on grounds that they are barred by the statute of repose for

4

the Tennessee Products Liability Act ("TPLA"), Tenn. Code Ann. § 29–28-103. [Doc. 17.] The Court will address each claim in turn.

### III. LEGAL STANDARD

Under Federal Rule of Civil Procedure 8(a)(2), "[a] pleading that states a claim for relief must contain … a short plain statement of the claim showing that the pleader is entitled to relief." To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the plaintiff's complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the plaintiff pleads facts that create a reasonable inference that the defendant is liable for the alleged conduct in the complaint. *Id.*

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court "must accept all well-pleaded factual allegations of the complaint as true and construe the complaint in the light most favorable to the plaintiff." *Benzon v. Morgan Stanley Distrib., Inc.*, 420 F.3d 598, 605 (6th Cir. 2005) (citations omitted). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," however. *Iqbal*, 556 U.S. at 678. Further, a plaintiff's allegations must consist of more than "labels and conclusions" and "formulaic recitation[s] of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (citation omitted); *see Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.") (citation omitted).

## IV. ANALYSIS

A.     **Count I – Intentional Tort Claim Against Nyrstar.**

The TWCL "provides the exclusive remedy for an employee who is injured during the course and scope of his employment, meaning the employee is precluded from seeking tort damages for the injury." *Valencia v. Freeland and Lemm Const. Co.*, 108 S.W.3d 239, 242 (Tenn. 2003) (citing *Liberty Mut. Ins. Co. v. Stevenson*, 368 S.W.2d 760 (Tenn. 1963)). Tennessee courts, however, "have created an exception to the exclusivity provision for intentional torts committed by an employer against an employee." *Id.* (citations omitted).

The intentional-tort exception is narrow and strictly construed. *Henry v. CMBB, LLC*, 797 F.App'x 258, 261 (6th Cir. 2020) (citations omitted). To sustain an action under the exception, a complaint must "allege facts showing that the employer actually intended to injure the employee." *Valencia*, 108 S.W.3d at 243. Unlike intent in traditional tort law, actual intent cannot be established by demonstrating that "the tortfeasor believes 'that the consequences are substantially certain to result from [his] actions.'" *Henry*, 797 F.App'x at 261 (quoting *Valencia*, 108 S.W.3d at 243). Instead, factual allegations must create a reasonable inference of "a deliberate determination on the part of the employer to cause injury combined with the undertaking of some means appropriate to that purpose." *Johnson v. Dollar Gen. Corp.*, No. 2:06-cv-173, 2008 WL 2781660, at *8 (E.D. Tenn. July 14, 2008). Courts have consistently held that "knowingly permitting a hazardous work condition to exist, knowingly ordering a claimant to perform an extremely dangerous job, [and] willfully and unlawfully violating a safety statute" is conduct that "falls short" of actual intent. *King v. Ross Coal Co., Inc.*, 684 S.W.2d 617, 619 (Tenn. Ct. App. 1984); *see, e.g.*, *Henry*, 797 F.App'x 258 (affirming dismissal where employee injured after employer knowingly left malfunctioning equipment in service); *Valencia*, 108 S.W.3d 239

6

(affirming dismissal where employee injured after employer violated safety standard for which it was previously cited).

Plaintiff alleges that the TWCL's exclusivity provision is inapplicable in this action because Nyrstar actually intended to injure or kill Mr. Maggard when it "intentionally assigned [him] and Hackney to operate a known unsafe locomotive with a defective braking system" in the 484 Gallery, an area with known hazards including a slick wet track, a protruding chute, and no stopblocks to prevent the subject locomotive from colliding with the chute. [Compl., Doc. 1 ¶ 28.] In its Motion to Dismiss, Nyrstar argues that the facts pleaded by Plaintiff are insufficient to sustain a claim based on the intentional-tort exception because there are no facts showing that "Nyrstar made a deliberate determination to injure Mr. Maggard and undertook some means to effectuate that purpose." [Nyrstar Mem. Supp. Mot. Dismiss, Doc. 22 at 7.] In response, Plaintiff asserts that she has properly stated a claim for relief because the facts of this case are like the facts of *Amos v. Bodycote Thermal Processing, Inc.*, No. 2:15-CV-185, 2016 WL 11500385, (E.D. Tenn. May 31, 2016), where this Court found that the plaintiff had stated a claim under the intentional tort exception. [Pl.'s Resp. Nyrstar, Doc. 23 at 2.] The Court disagrees. *Amos* is the exception, not the rule, and it is distinguishable here.

In *Amos*, the plaintiff was injured in an explosion after someone intentionally disabled a safety device on an industrial furnace. *Id.* at *3–4. The *Amos* plaintiff alleged that, prior to his injury, he had "reported safety concerns and repeatedly complained to the defendant about disabled safety devices … [and] complained about other employees intentionally disabling safety devices and asked management to correct the situation." *Id.* at *3. In addition to his intentional tort claim, he brought claims for violations of the Tennessee Public Protection Act, common law retaliatory discharge because of whistleblowing activity, and retaliatory discharge pursuant to the TWCL. *Id.*

7

at *1. This Court held that, in light of the plaintiff's previous complaints to his employer, "it [was] certainly possible to conclude there was an actual intent to injure the plaintiff possibly in retaliation for the complaints or to stop future complaints." *Id.* at *4.

Unlike in *Amos*, Plaintiff has not alleged that Mr. Maggard made any complaints regarding safety issues at the mine or that animosity existed between him and Nyrstar or any of his coworkers. Nor are Plaintiff's claims here brought alongside retaliation allegations. The law on the intentional-tort exception definitively provides that knowledge of dangerous conditions is insufficient to establish actual intent. *King,* 684 S.W.2d at 619. Thus, Nyrstar's knowledge of the subject locomotive's defective condition and hazards in the 484 Gallery, without more, is insufficient to create a reasonable inference that it was "deliberately determine[ed]" to injure Mr. Maggard. *Johnson*, 2008 WL 2781660, at *8. Accordingly, Nyrstar's Motion to Dismiss Plaintiff's intentional tort claim (Count I) is **GRANTED**.

Furthermore, Plaintiff substantially relied on the MSHA report of investigation to establish the factual bases for her intentional tort claim. While not relied on by the Court, the report, which provides additional detail regarding the accident sequence, supports the Court's holding. *Cf. Burns v. United States*, 542 F.App'x 461, 466 (6th Cir. 2013) ("A document referred to or attached to the pleadings, and integral to plaintiff's claims, may also be considered without converting a motion to dismiss into one for summary judgment.") (citing *Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 336 (6th Cir. 2007)). According to the report:

> [W]hen the locomotive was within 20 feet from the chute, the locomotive was not decelerating [from a speed of approximately 5.6 feet per second]. From the video, investigators could see that Maggard glanced at Hackney. Hackney was not looking in the direction of travel. When the locomotive was within 15 feet of the chute, Maggard reached over to the locomotive operator's control panel in an attempt to remove Hackney's hand from the throttle. At approximately ten feet from the chute, Maggard applied the locomotive's service brake. Hackney reach for the service brake as well []. Just before the locomotive collided with the chute, both miners

8

stood and braced for impact. Upon impact, Hackney reached for the chute with his hands as it entered the operator's deck of the locomotive. The locomotive crushed Maggard between the chute and locomotive deck. After impact, Hackney drove the locomotive away from the chute. Hackney checked Maggard's condition and called for help on his hand-held radio.

(MSHA Report, at 2–3, 6.) Mr. Maggard's accident was tragic and the Court is sympathetic to his widow's loss. The facts of the accident, however, do not create a reasonable inference that Nyrstar actually intended to injure Mr. Maggard.

**B.  Counts II–IV – Products-Liability Claims Against the Brookville Defendants.**

The TPLA establishes the statutory framework for bringing defective product claims against manufacturers and sellers and it supersedes common law claims for strict liability, breach of warranty, and product negligence. *Coffman v. Armstrong Int'l, Inc.*, 615 S.W.3d 888, 896 (Tenn. 2021). "To state a claim for relief under the TPLA plaintiffs must plausibly allege that each defendant is either a manufacturer or seller as defined by the statute and that "'(1) the product was defective and/or unreasonably dangerous, (2) the defect existed at the time the product left the defendant's control, and (3) the plaintiff's injury was proximately caused by the defective product.'" *Steverson v. Walmart*, No. 3:19-cv-00140, 2020 WL 4700831, at *4 (M.D. Tenn. Aug. 13, 2020) (cleaned up and quoting *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008)). The statute defines "manufacturer" as "the designer, fabricator, producer, compounder, processor or assembler of any product or its component parts[.]" Tenn. Code Ann. § 29-28-102(4). It defines "seller" as "any individual or entity engaged in the business of selling a product[.]" Tenn. Code Ann. § 29-28-102(7).

Under the TPLA's statute of repose, products-liability actions "must be brought within ten (10) years from the date on which the product was first purchased for use[.]" Tenn. Code. Ann. § 29-28-103(a). In *Fugate v. AAA Mach. & Equip. Co.*, 593 F.Supp. 392 (E.D. Tenn. 1984), however,

9

this Court held that there is a limited exception for rebuilt or reconditioned products. Specifically, it held that "a piece of machinery that is substantially rebuilt or reconditioned becomes a "new" product for the purpose of a products liability action and [] a new statute of limitations begins to run from the date of its sale." *Id.* at 393. The few cases considering this exception have consistently held that it only applies where a product has been rebuilt *and* reintroduced into the stream of commerce (i.e., resold). *See Rollins v. Cherokee Warehouses, Inc.*, 635 F.Supp. 136, 138–39 (E.D. Tenn. 1986) (rebuilt exception applicable where rebuild performed by a manufacturer or re-manufacturer/seller who places the product back into the stream of commerce); (*Lillard v. Positive Safety Mfg. Co.*, No. 89-18-II, 1989 WL 54912, at *2 (Tenn. Ct. App. May 24, 1989) (finding *Fugate* inapplicable where "there had not been a reconditing and resale of the" product at issue); *see also Butchkosky v. Enstrom Helicopter Corp.*, 855 F.Supp. 1251, 1254–55 (S.D. Fla. 1993) (observing that *Fugate* applies where manufacturer takes possession and title of the product, rebuilds it, and then re-sells it into the stream of commerce). Thus, to sustain a products-liability claim based on the rebuilt exception, a plaintiff must allege that the product at issue was (1) rebuilt and (2) resold.

Plaintiff alleges that the subject locomotive was defective because it was not equipped with the emergency/park brake test button, thus preventing the brake system from being tested in accord with Bulletins 70 and 71, and that the Brookville Defendants had a duty to retrofit the locomotive to remedy the defect. [Compl., Doc. 1 ¶¶ 31, 37, 41, 46.] In their Joint Motion to Dismiss, the Brookville Defendants argue that Plaintiff's products-liability claims are barred by the TPLA's statute of repose. [Brookville Defs.' Mot. Dismiss, Doc. 17 at 2–4.] In response, Plaintiff asserts that the Court should not dismiss her claims because any substantial rebuild of the subject locomotive would render it a "new" product. [Pl.'s Resp. Brookville Defs., Doc. 25 at 15.]

10

Plaintiff's factual allegations are insufficient to sustain a products-liability claim against the Brookville Defendants because she has not sufficiently pleaded that the nearly thirty-year-old subject locomotive was rebuilt and has not alleged that it was resold. *Fugate*, 593 F.Supp. at 393.

Regarding her rebuilding allegation, Plaintiff states in her Complaint that "[o]n or before [the date of the accident], the Brookville [D]efendants (either one and/or both) … rebuilt" the subject locomotive. [Compl., Doc. 1 ¶ 30.] Yet, in response to the Brookville Defendants' Joint Motion to Dismiss, Plaintiff admits that she does not actually know "whether or not the Brookville [D]efendants engaged in any re-build … that would render [the subject locomotive] a "new" product" and instead asserts that she should be allowed to conduct discovery on the matter. [Pl.'s Resp. Brookville Defs., Doc. 25 at 3.] Plaintiff's formulaic recitation of one of the elements for a cause under the rebuilt exception, devoid of any supporting facts, is insufficient under Federal Rule of Civil Procedure 8(a). *Twombly*, 550 U.S. at 555 (citation omitted); *see Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.") (citation omitted); *see also New Albany Tractor, Inc. v. Louisville Tractor, Inc.*, 650 F.3d 1046, 1050–51 (6th Cir. 2011) ("[C]ourts may no longer accept conclusory allegations that do not include specific facts necessary to establish the cause of action" and "plaintiff[s] may not use the discovery process to obtain [] facts after filing suit.").

Even if Plaintiff's rebuilding allegation was sufficient, she has not alleged that the locomotive was resold, and that is a necessary element for triggering the TPLA's rebuilt exception. *Fugate*, 593 F.Supp. at 393. Nor are there any facts in the Complaint from which the Court could infer that the subject locomotive has been resold. *Lewis v. ACB Bus. Servs., Inc.*, 135 F.3d 389, 406 (6th Cir. 1998) ("A complaint must contain either direct or inferential allegations respecting

11

all the material elements to sustain recovery under some viable legal theory.") (cleaned up and citations omitted).

Moreover, as to Brookville Services, Plaintiff admits that it "did not manufacture … and/or sell the subject locomotive[.]" [Pl.'s Resp. Brookville Defs., Doc. 25 at 2.] Thus, even if Brookville Services had completely rebuilt the subject locomotive, Plaintiff could not sustain a products-liability claim against it because the TPLA only provides for products-liability claims against manufacturers or sellers. *Steverson*, 2020 WL 4700831, at *4. Accordingly, the Brookville Defendants' Joint Motion to Dismiss Plaintiff's products-liability claims (Counts II–IV) is **GRANTED**.

C.   **Count V – Negligence Claim Against Brookville Services.**

Brookville Services has moved to dismiss Plaintiff's negligence claim on grounds that it is barred by the TPLA's ten-year statute of repose. [Brookville Defs.' Mot. Dismiss, Doc. 17 at 2–4.] Plaintiff's claim, however, is a negligence claim against Brookville Services in its capacity as Nyrstar's maintenance service provider, not as a manufacturer or seller. [Compl., Doc. 1 ¶ 43–48; Pl.'s Resp. Brookville Defs., Doc. 25 at 2, 10–13.] Thus, the TPLA is inapplicable. *Coffman*, 615 S.W.3d at 896 (establishing that the TPLA is for bringing defective product claims against manufacturers and sellers).

In support of her negligence claim, Plaintiff alleges that Brookville Services provided day-to-day field maintenance support and services to Nyrstar for the subject locomotive and that the subject locomotive's brakes were "excessively worn," "the brake system was not maintained in proper adjustment," the "slack adjusters on both the operator and offside brake canisters had excessive travel," the "hanger pins" were in disrepair, and "[b]rake components were rusted and muddy." [Compl., Doc. 1 ¶ 18; Pl.'s Resp. Brookville Defs., Doc. 25 at 2, 10–13.] Taking

12

Plaintiff's factual allegations as true, the Court finds that she has properly stated a negligence claim against Brookville Services arising from its maintenance services for the subject locomotive. Accordingly, Brookville Services' Motion to Dismiss Plaintiff's negligence claim (Count V) is **DENIED**.

D.   **Count VI – Loss of Consortium Claim Against All Defendants.**

Under Tennessee law, a loss of consortium claim is a derivative claim that is subject to dismissal when the underlying claim is dismissed. *See Waterhouse v. Tenn. Valley Auth.*, 475 F.Supp.3d 817, 827–28 (E.D. Tenn. 2020). The Court has granted Nyrstar's Motion to Dismiss Plaintiff's intentional tort claim (Count I) and the Brookville Defendants' Joint Motion to Dismiss Plaintiff's products-liability claims (Counts II–IV) and denied Brookville Services' Motion to Dismiss Plaintiff's negligence claim (Count V). Therefore, Nyrstar and the Brookville Defendants' Motions to Dismiss Plaintiff's loss of consortium claims arising from Counts I–IV are **GRANTED** and Brookville Services' Motion to Dismiss Plaintiff's loss of consortium claim arising from Count V is **DENIED.**

## V. CONCLUSION

For the reasons stated above, Nyrstar's Motion to Dismiss Counts I and VI is **GRANTED** and the Brookville Defendants' Joint Motion to Dismiss Counts II–VI is **GRANTED IN PART**, as to Counts II–IV and VI against Brookville Equipment and Counts II–IV against Brookville Services, and **DENIED IN PART**, as to Counts V and VI against Brookville Services.

So ordered.

ENTER:

s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE
