| | | |
|---|---|---|
| ASHLEY N. MAGGARD, as Widow and Administratrix of the Estate of CODY S. MAGGARD, | ) ) ) ) | |
| Plaintiff, | ) ) | No. 3:22-CV-00069-JRG-JEM |
| v. | ) ) | |
| BROOKVILLE SERVICES, LLC, | ) ) | |
| Defendant. | ) | |

# MEMORANDUM OPINION

This diversity suit arises out of a fatal locomotive accident that occurred at the Immel Mine in Knox County, Tennessee. Ashley Maggard, as widow and administratrix to the deceased, filed personal injury and products liability claims against Nyrstar Tennessee Mines – Strawberry Plains LLC ("Nyrstar"), the owner of the mine; Brookville Equipment Corporation ("Brookville Equipment"), the Pennsylvania-based manufacturer of the locomotive involved in the accident; and Brookville Services, LLC ("Brookville Services"), a subsidiary of Brookville Equipment that provides services support. [Doc. 1]. Plaintiff also brought claims of loss of consortium against all three defendants. [*Id.*]. The Court subsequently granted motions to dismiss by Nyrstar and Brookville Equipment and granted in part a motion to dismiss by Brookville Services. [Doc. 32].

Defendant Brookville Services now moves for summary judgment on Plaintiff's remaining claims of negligent services and loss of consortium. [Doc. 41].[1] For the reasons discussed below, Defendant's motion for summary judgment will be **GRANTED**.

---

[1] In her response in opposition to summary judgment, Plaintiff asserted, among other arguments, that summary judgment was premature because she had not yet deposed Nyrstar's corporate representative. [Doc. 46 at 13–14]. The Court extended the discovery deadline and allowed Plaintiff to file a supplemental response in opposition. [Doc. 51 at

## I. BACKGROUND

### A. Accident and MSHA Investigation

The Immel Mine is an underground zinc-ore mine in Knox County, Tennessee, owned and operated by Nyrstar. [Doc. 46-3 at 4].[2] As part of the mine's operations, locomotives are used to transport ore, which is fed down a chute suspended above the track into the hopper cars attached to the locomotive. [*Id.* at 5]. The chute is high enough over the track so that hopper cars can pass underneath, but too low for locomotives to do so. [*Id.* at 9]. There are no warning signs or lights alerting locomotive operators to the chute's low clearance or stopblocks or other stopping devices to prevent locomotives from colliding with the chute. [*Id.*].

On February 22, 2021, Cody Maggard and his fellow miner, Harold Hackney, were hauling ore at the Immel Mine, using a locomotive originally manufactured by Brookville Equipment. [*Id.* at 5–6]. Surveillance footage shows Hackney was operating the locomotive, with Maggard in the passenger seat, as the men returned to the chute for another load of ore. [*Id.* at 6]. The locomotive did not decelerate as it approached the chute, and Hackney was not looking in the direction of travel. [*Id.*]. When the locomotive was approximately ten feet away from the chute Maggard applied the service brake. [*Id.*]. However, the locomotive failed to stop, and Maggard was crushed between the chute and the locomotive deck. [*Id.*].

Investigators from the United States Department of Labor Mine Safety and Health Administration ("MSHA") arrived at the mine shortly after the accident. [Doc. 46-3 at 7]. The investigators noted that the braking system did not comply with standards set out in two Product

---

10]. The Court has considered Plaintiff's supplemental response [Doc. 52], which includes evidence from the deposition of the Nyrstar corporate representative, in deciding the motion for summary judgment.

[2] All citations to page numbers refer to the sequential page number assigned to the document by CM/ECF, located at the bottom of the page in blue text.

2

Information Bulletins ("Bulletins") issued by Brookville Equipment in 2013 and 2014. [*Id.* at 8]. The locomotive had not been maintained in compliance with the 2013 Bulletin—which described the proper procedures for inspecting brake shoes for maximum wear allowance—because the brake shoes were excessively and unevenly worn. [Doc. 46-7 at 1–5; Doc. 46-3 at 8]. The 2014 Bulletin explained that in order to test the emergency/park brake on locomotives with a transmission interlock system, the operator's panel had to be equipped with an emergency/park brake test button. [Doc. 46-7 at 6–7]. However, the subject locomotive, which Nyrstar had modified to include a transmission interlock system, was not equipped with such a button. [Doc. 46-3 at 8].

Ultimately, MSHA identified six "root causes" of the accident that were attributable to Nyrstar: (1) failure to properly maintain the locomotive's braking system; (2) a lack of procedures and derail devices to prevent locomotives from traveling into the chute; (3) absence of warning signs or lights to alert miners about the low clearance of the chute; (4) failure to conduct proper examinations of the locomotive; (5) failure to properly maintain the tracks; and (6) failure to identify hazardous track conditions or locomotive deficiencies during workplace examinations. [*Id.* at 11]. MSHA issued several citations to Nyrstar for safety violations. [*Id.* at 12–15].

###    B.    History of the Subject Locomotive

The subject locomotive was originally manufactured by Brookville Equipment and sold to ASARCO in 1993. [Doc. 46-5 at 28]. Around 2006, Nyrstar obtained ownership of the locomotive when it purchased the Immel Mine. [Doc. 49-3 at 7]. In 2007, Pillar Manufacturing ("Pillar") rebuilt the locomotive's brake system. [Doc. 52-1 at 22]. Also, at some point prior to the accident, a company other than Brookville Equipment performed substantial modifications on the locomotive, including the addition of steel plates to increase the weight of the unit; an engage

3

panel with limited function monitoring and no warning lights; a new fire suppression reservoir; an electronically controlled diesel engine; and an electronically controlled transmission that contained an interlock system. [Doc. 46-5 at 12, 21, 23, 27, 28]. A senior technician from Brookville Equipment who viewed the locomotive after the accident observed that the only part of the locomotive that appeared to be original to Brookville was the axle. [Doc. 46-5 at 21–22].

Nyrstar employees handle the day-to-day repairs, maintenance, and pre-use inspections on Nyrstar's locomotives, including the subject locomotive. [Doc. 52-1 at 23, 25, 27]. In October 2020, Nyrstar performed a 2,000-hour preventive maintenance check on the subject locomotive using a Pillar 12-ton locomotive service manual. [*Id.* at 23]. In November 2020, Nyrstar employees replaced the brake pads and chambers. [*Id.* at 25]. In December 2020, Nyrstar employees adjusted the brakes. [*Id.*]. On February 14, 2021, they replaced the brake chamber. [*Id.*]. And on February 15, 2021, one week prior to the accident, Nyrstar conducted a 500-hour preventive maintenance on the subject locomotive, again using a Pillar service manual. [*Id.* at 26].

On the shift prior to the accident, Nyrstar employees conducted a pre-use inspection of the subject locomotive, noting no problems. [*Id.* at 24; Doc. 53-4 at 2]. At the beginning of their shift on the day of the accident, Harold Hackney completed a pre-use inspection of the subject locomotive and also noted no problems. [Doc. 52-1 at 24; Doc. 53-4 at 2].

C.     **Brookville Services' Visits to Immel Mine in 2020**

In the summer of 2020, Nyrstar hired Brookville Services to provide a rebuild quote for two locomotives, one of which was the subject locomotive. [Doc. 46-6 at 3]. Nyrstar asked Brookville to provide a quote for a rebuild that would comply with MSHA standards. [Doc. 46-6 at 17]. On July 28, 2020, a Brookville Services technician visited the Immel mine and spent nine hours evaluating the two locomotives. [Doc. 52-2 at 2; Doc. 52-3 at 1–2]. Brookville Services

4

afterward submitted a quote to Nyrstar, noting that all of the parts on the subject locomotive were obsolete, including the brakes, and would need to be replaced. [Doc. 52-4 at 1]. Ultimately, Nyrstar did not hire Brookville to perform the rebuild. [Doc. 52-1 at 27].

Nyrstar also hired a Brookville Services technician to visit the Immel Mine on August 12–13, 2020, to oversee the installation of a transmission in a locomotive, possibly the subject locomotive. [Doc. 46-6 at 8–9]. The technicians were unable to install the transmission due to modifications that had been made to the locomotive. [*Id.* at 9].

Brookville did not have a contract, service agreement or warranty with Nyrstar to provide maintenance on any locomotive in 2020 or at any time prior to the accident. [Doc. 52-1 at 28]. Prior to the accident, Nyrstar did not contact Brookville to work on the brake system of the subject locomotive, or any locomotive. [Doc. 46-5 at 28, 29]. Brookville did not have authority to enter the Immel mine or provide services for any locomotives without Nyrstar's permission. [*Id.* at 29]. In order for Brookville to perform work for Nyrstar, Brookville required a purchase order. [*Id.*].

## II.  LEGAL STANDARD

A grant of summary judgment is proper, pursuant to Federal Rule of Civil Procedure 56, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Material facts are those defined by substantive law and necessary for the application of the law. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). A genuine issue of material fact exists if the evidence would permit a reasonable jury to return a verdict for the non-moving party. *Id.*

The U.S. Supreme Court interprets Federal Rule Civil Procedure 56 as mandating the entry of summary judgment "after adequate time for discovery and upon motion, against a party who

5

Case 3:22-cv-00069-JRG-JEM   Document 72   Filed 03/21/24   Page 5 of 11   PageID #: 1461

fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. A failure of proof concerning an element of the nonmoving party's prima facie case renders all other facts immaterial. *See id.* A party seeking summary judgment bears the initial responsibility of informing the Court of the basis for its motion. *Id.* at 323.

### III. DISCUSSION

Moving for summary judgment, Defendant asserts that there are no genuine issues of material fact and it is entitled to judgment as a matter of law on Plaintiff's negligence claim. [Doc. 41]. Under Tennessee law, the essential elements of a negligence claim are "(1) a duty of care owed by defendant to plaintiff; (2) conduct below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate, or legal, cause." *Giggers v. Memphis Hous. Auth.*, 277 S.W.3d 359, 364 (Tenn. 2009) (citation omitted). Defendant asserts that Plaintiff cannot establish the first or fourth elements. [*Id.* at 2]. The Court will focus on the first element, that of duty, which is dispositive in this case.

Duty is "the legal obligation of a defendant to conform to a reasonable person's standard of care in order to protect against unreasonable risks of harm." *Id.* "[P]ersons do not ordinarily have a duty to act to protect others from dangers or risks except for those that they themselves have created." *Satterfield v. Breeding Insulation Co.*, 266 S.W.3d 347, 357 (Tenn. 2008). This principle, sometime called the no-duty rule, "is consistent with the Restatement's position that '[t]he fact . . . the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action.'" *Id.* at 357 (quoting the Restatement (Second) of Torts § 314, at 116).

An exception to the no-duty rule occurs when "a person voluntarily assumes a duty of care, in which case, '[o]ne who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully.'" *Neeley v. Piedmont Nat. Gas Co.*, No. M2005-02446-COA-R3-CV, 2007 Tenn. App. LEXIS 88, at *11 (Ct. App. Feb. 15, 2007) (quoting *Draper v. Westerfield*, 181 S.W.3d 283, 291 (Tenn. 2005)) (citation omitted). When determining whether a defendant voluntarily assumed a duty to a third party, Tennessee courts have applied Section 324A of the Restatement (Second) of Torts. *Grogan v. Uggla*, 535 S.W.3d 864, 871 (Tenn. 2017). Section 324A provides, in relevant part, that an individual does not voluntarily assume a duty to third parties unless he "undertakes . . . to render services to another which he should recognize as necessary for the protection of a third person or his things." Restatement (Second) of Torts § 324A.

"Under Restatement section 324A, a duty can only be imposed to the extent actually assumed by the defendant." *Grogan*, 535 S.W.3d at 874 (internal citation omitted); *see also McAtee v. Fluor Constructors Int'l, Inc.*, No. 98-5927, 1999 U.S. App. LEXIS 21040, at *16 (6th Cir. Aug. 27, 1999) (citation omitted) ("An actor's specific undertaking of the services allegedly performed without reasonable care is a threshold requirement to section 324A liability."); *Walls v. FTS Int'l, Inc.*, No. 2:17-CV-00872-MJH, 2019 U.S. Dist. LEXIS 457, at *13 (W.D. Pa. Jan. 2, 2019) ("Section 324A does not give rise to an implicit or derivative duty that stems from another related duty undertaken by the defendant."). "[T]he question of whether one has assumed a duty to act is . . . a question of law." *McAtee*, 33 S.W.3d at 793.

Defendant asserts that it did not owe a duty of care to Mr. Maggard because it did not perform any work on the subject locomotive and had "no contract, service agreement, or warranty with Nyrstar to provide continued maintenance on any locomotive, including the locomotive at issue." [Doc. 41 at 8]. Defendant also contends that the locomotive had been significantly

7

modified, to the point where it was "basically a different locomotive from a Brookville locomotive" [*Id.* at 10].

In response, Plaintiff claims that Defendant voluntarily assumed a duty to Mr. Maggard when its technicians visited the Immel mine in 2020. [Doc. 46 at 4]. She contends that as "the service/maintenance provider in 2020 for the subject locomotive" and "a subsidiary and related entity to the original equipment manufacturer," Defendant assumed an obligation to protect Mr. Maggard by warning Nyrstar that the brakes on the subject locomotive were faulty and/or not in compliance with Brookville product bulletins.

First, the Court notes that there is no evidence that the brakes on the subject locomotive were faulty when Brookville technicians visited the mine, six months prior to the accident. The only evidence that the brakes on the subject locomotive were faulty comes from MSHA's investigation, after the accident.

In any event, the record does not support Plaintiff's claim that Defendant was the service/maintenance provider for the subject locomotive in 2020. Defendant did not have a contract, service agreement, or warranty to provide continued maintenance during that time. And prior to the accident, Nyrstar did not hire Defendant to work on the brake system of any of its locomotives. Rather, the record shows that the regular service/maintenance provider for Nyrstar's locomotives was Nyrstar. Nyrstar's employees performed preventive maintenance, repairs, and pre-use inspections on the subject locomotive's brakes during the time leading up to the accident.

Moreover, the record shows that Defendant did not assume a duty to Mr. Maggard when its technicians visited the mine in 2020. Nyrstar hired Defendant to perform only two tasks: to provide a MSHA-compliant rebuild quote for the subject locomotive and another locomotive, and to assist with the installation of a transmission. Neither of these tasks involved a request by Nyrstar

8

to identify MSHA violations or otherwise perform a safety inspection of the subject locomotive's brake system.[3] Nor is there evidence that Defendant assumed any responsibilities beyond what it was hired to do.

Defendant's status as a Brookville Equipment subsidiary does not change the analysis. To begin with, it is unclear whether the locomotive should even be considered a "Brookville locomotive," given the significant modifications it had undergone since its manufacture by Brookville Equipment in 1993. More importantly, Brookville Services technicians' knowledge of the information contained in the 2013 and 2014 Bulletins, without a specific assumption of duty, is insufficient to impose liability under 324A. *See Marr v. Montgomery Elevator Co.*, 922 S.W.2d 526, 530 (Tenn. Ct. App. 1995) (Tenn. Ct. App. 1995) (finding that the defendant maintenance company hired by the tourist attraction did not voluntarily assume a duty to protect an employee of the tourist attraction, despite the defendant's possible industry knowledge of code requirements).

*Grogan v. Uggla*, 535 S.W.3d 864 (Tenn. 2017) is instructive here. In that case, the Tennessee Supreme Court found that a home inspector did not voluntarily assume a duty to protect a homeowner's guest, who fell through the upper deck railing of a house the home inspector had recently inspected, sustaining significant injury. *Id.* at 876. The home inspector had informed the homeowner about problems with the upper deck floor but did not report that the deck railing was constructed in violation of applicable building codes. *Id.* at 866. The guest filed a lawsuit which included a negligent inspection claim against the home inspector. *Id.* at 869.

---

[3] Nyrstar's corporate representative, who did not work at the Immel Mine in 2020, testified in his deposition that he would expect any third party vendor evaluating a piece of equipment at the mine to inform him of any deficiencies regarding that piece of equipment. [Doc. 52-1 at 21]. However, there is no evidence that this expectation was communicated to Defendant.

9

Case 3:22-cv-00069-JRG-JEM   Document 72   Filed 03/21/24   Page 9 of 11   PageID #: 1465

Finding that no duty to the plaintiff arose under Section 324A, the *Grogan* court reasoned that even though safety is one purpose of a home inspection, the undertaking that the defendant actually assumed was to make a reasonable effort to determine the condition of the house, not to perform a building code inspection. *Id.* at 874. The court also noted that the inspection was conducted for the homeowner, not for the benefit of third parties. *Id.* at 876. Because the defendant did not specifically undertake to perform a building code inspection or to render services that he should have known were necessary for the protection of third parties, the defendant did not assume a duty to the plaintiff and summary judgment was warranted. *Id.*

Like the home inspection in *Grogan*, the services that Defendant provided Nyrstar were related to safety concerns, but a comprehensive safety inspection was beyond the scope of the duty Defendant undertook. Also, as with the home inspection in *Grogan*, the inspection that Defendant undertook to determine a rebuild quote was not a service intended for the protection of third parties. Hence, the Court concludes that Defendant did not voluntarily assume a duty to protect Mr. Maggard. Given that Plaintiff has not established any other basis for the element of duty, Defendant is entitled to summary judgment on Plaintiff's negligence claim.

Plaintiff's loss of consortium claim will also be dismissed. Under Tennessee law, a loss of consortium claim is a derivative claim that is subject to dismissal when the underlying claim is dismissed. *See Waterhouse v. Tenn. Valley Auth.*, 475 F.Supp.3d 817, 827–28 (E.D. Tenn. 2020). Because the Court dismissed Plaintiff's negligence claim, the Court must also grant summary judgment on Plaintiff's loss of consortium claim.

IV. **CONCLUSION**

For the foregoing reasons, Defendant's Motion for Summary Judgment [Doc. 41] will be **GRANTED** and this action will be **DISMISSED**.

A judgment to enter.

So ordered.

ENTER:

s/J. RONNIE GREER<br>UNITED STATES DISTRICT JUDGE